In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3192

MARY HALEY, *et al.*

*Plaintiffs-Appellants*,

*v.*

KOLBE & KOLBE MILLWORK CO.

*Defendant-Appellee*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 14-cv-99-bbc — **Barbara B. Crabb**, *Judge*.

ARGUED MARCH 28, 2017 — DECIDED JULY 11, 2017

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Seven pairs of spouses and one indi-
vidual filed this putative class action against Kolbe & Kolbe
Millwork Company, alleging that Kolbe sold them defective
windows that leak and rot. Plaintiffs brought common-law
and statutory claims for breach of express and implied war-
ranties, negligent design and manufacturing of the windows,
negligent or fraudulent misrepresentations as to the condition
of the windows, and unjust enrichment. The district court

granted partial summary judgment in Kolbe's favor on a number of claims, eventually excluded plaintiffs' experts and denied class certification, and ultimately found that plaintiffs' individual claims likewise could not survive without expert support. We affirm.

## I. Background

### A. Factual Background

Kolbe is a Wisconsin corporation that designs, manufactures, and sells windows. Plaintiffs-appellants live in Michigan (Mary and Michael Haley, and Terrance and Jean McIver), Florida (Leslie and Hal Banks), Pennsylvania (Annie and Brian Buinewicz, and Susan and Christina Senyk), Ohio (Matthew and Renee Deller), New Hampshire (Patricia Groome and Gary Samuels), and Wisconsin (Marie Lohr); and all had Kolbe windows installed in their homes at different times since 1997.

Also since 1997, Kolbe has issued at least seven different versions of a written window warranty.[1] In addition, certain

---

[1] Each version includes, among other things, a warranty that the windows shall be free from defects that would render them unfit for ordinary use; a statement that Kolbe's obligation under the warranty is limited, at Kolbe's option, to the repair, replacement, or refund of the purchase price of the window; a statement that the warranty is conditional on the window's being installed, finished, maintained, and operated in accordance with Kolbe's instructions; certain exclusions, including those related to environmental conditions and the type of structure in which the window has been installed; disclaimers of other written and implied warranties; and a requirement that claimants provide written notice of warranty claims. The warranties for plaintiffs-appellants' windows also differ in a number of respects, including the length of the warranty (one year for windows purchased in 1997 versus ten years for windows purchased in 1998 or later); the number and type of exclusions; the time period within which to file

of the plaintiffs-appellants' Kolbe windows were finished with an optional exterior paint, known as the "K-Kron system," that came with its own warranty. Kolbe has issued at least six different versions of the K-Kron warranty.[2]

All plaintiffs-appellants experienced one or more problems with some of their windows, including leaking, warping, rotting, or cracking or peeling paint. Kolbe's responses to plaintiffs' problems varied, ranging from doing nothing (*e.g.*, with respect to the Haleys and the Senyks) to making recommendations on maintenance and care (*e.g.*, to the Bankses, the McIvers, the Dellers, Groome and Samuels, and Lohr) to replacing a number of window sashes—that is, the movable panels that form the frame holding the glass pane(s)—(*e.g.*, for the Bankses, the Buinewiczes, the Dellers, and Lohr). All of the plaintiffs-appellants eventually concluded that Kolbe would not honor its written warranties.

---

written notice of a warranty claim; and the existence of a choice-of-law provision (as of October 2002, the warranties included a Wisconsin choice-of-law provision).

[2] Each of the K-Kron warranties includes, among other things, a guarantee that the K-Kron system will resist cracking, peeling, and flaking of the applied paint film for a period of ten years after purchase (in pre-2012 warranties) or shipment (from 2012 onward); a statement that Kolbe reserves the right to determine the best method to correct the situation; a Wisconsin choice-of-law provision (from 2002 onward); disclaimers of other express and implied warranties; various conditions, including a requirement that all faces and edges must be thoroughly finished and that the owner must follow Kolbe's written instructions regarding finishing, maintenance, operation, and refinishing; and a requirement that customers provide written notice of a warranty claim either "promptly" (in versions predating October 2002) or within thirty days of discovery (from October 2002 onward).

### B. Procedural Background

#### 1. *Amended Complaint*

Plaintiffs-appellants filed this putative class action against Kolbe in February of 2014. Their amended complaint alleged numerous causes of action:

- Breach of express warranties, including Kolbe's written warranties stating that the windows would remain free from defects ("no-defect" written-warranty claims) and that Kolbe would repair, replace, or refund the price of defective windows ("failure-to-honor" written-warranty claims), as well as other warranties allegedly stemming from statements in Kolbe advertising (advertising-warranty claims);
- Breach of implied warranty of merchantability and implied warranty that windows were fit "for their intended use";
- Negligent misrepresentation;
- Negligence;
- Unjust enrichment;
- Violations of Wisconsin's Deceptive Trade Practices Act ("WDTPA"), Wis. Stat. § 100.18; and
- Violations of Wisconsin's Home Improvement Practices Act ("HIPA"), Wis. Admin. Code ATCP § 110.

All plaintiffs except Samuels and Groome later voluntarily dismissed their WDTPA claims, and the district court granted Kolbe's motion to dismiss the HIPA claims. The remaining

claims were all premised on the allegation that Kolbe windows had common design defects that caused them to rot prematurely.[3]

### 2. Partial Summary Judgment

In February 2015, Kolbe moved for partial summary judgment, arguing that a number of plaintiffs' claims were barred by the applicable statutes of limitations and the economic loss doctrine, and that plaintiffs had failed to establish the elements of some of their claims. Plaintiffs challenged Kolbe's statute-of-limitations arguments with respect to their express-warranty and fraudulent-misrepresentation claims, but did not respond as to their claims of breach of implied warranty for six sets of plaintiffs, or to any of the claims for negligence, negligent misrepresentation, or unjust enrichment.

In June 2015, the district court granted summary judgment with respect to the following claims:

- The Buinewicz plaintiffs' express-warranty claims (both "no-defect" and "failure-to-honor"), because the Buinewiczes had first discovered rot in their windows in 2003—six years after the one-year warranty period had ended;
- The McIver plaintiffs' "no-defect" express-warranty claim, because it was barred under the applicable four-year statute of limitations, and the McIvers had not developed arguments justifying the claim's survival;

---

[3] Aluminum-clad windows allegedly suffered from a defect where the sash met the sill (*i.e.*, where the lower sash rested when the window was closed), while all-wood windows suffered from a defect of the K-Kron or K-Kron II paint with which they had been coated.

- All plaintiffs' advertising-warranty claims, because some were barred by the statute of limitations and the remaining ones (for the Haleys and Samuels and Groome) involved statements that were mere puffery or otherwise too vague to support such a claim;
- The Banks, Buinewicz, McIver, Senyk, Deller, and Lohr plaintiffs' implied-warranty claims, both because plaintiffs had abandoned the claims by failing to identify the factual bases, and because the claims were barred under the relevant statute of limitations;
- The Samuels and Groome plaintiffs' fraudulent-misrepresentation claim, because both had testified that their builder had offered only Kolbe windows and that this fact had not influenced their decision to buy their home through that builder; and
- All plaintiffs' negligence, negligent-misrepresentation, and unjust-enrichment claims, because plaintiffs had waived the claims by failing to respond to Kolbe's arguments in its motion for summary judgment.

On October 21, 2015, Groome and Samuels moved for reconsideration of the grant of summary judgment on their fraudulent-misrepresentation claim.[4] They asserted that they had newly discovered evidence (a 2005 Kolbe email, which plaintiffs had received three months prior to the district court's summary judgment decision) showing that Kolbe had made false representations in its product literature and labeling related to, *inter alia*, the company's compliance with manufacturing standards and building codes, and its methods for

---

[4] Plaintiffs technically filed their motion under Federal Rule of Civil Procedure 60(b)(2), but judgment had not yet been entered in the case, so the district court treated the motion as one for reconsideration.

certifying its windows (*i.e.*, testing only certain "ringer" windows to pass certification).

In November 2015, the district court denied the motion for reconsideration, finding that plaintiffs had still failed to identify the particular representations that they believed Kolbe had made to any member of the public concerning these issues and had not explained how any alleged misrepresentation or false statement had caused pecuniary loss to Groome and Samuels, as the fact that their builder had offered only Kolbe windows had not influenced their decision to buy their home.

### 3. *Discovery Dispute*

Meanwhile, by March 2015, when Kolbe's motion for partial summary judgment was still pending, Kolbe had completed rolling productions of eleven of fourteen categories of documents, and had partially completed the other three. In August 2015, plaintiffs moved to reopen discovery and impose sanctions, claiming that Kolbe had "engaged in sandbagging throughout the discovery process, producing prodigious amounts of discovery at disadvantageous times for plaintiffs, dragging its feet on production of discoverable information and generally not cooperating." Kolbe responded that it had "cooperated from the beginning in the production of discovery, but was thwarted by plaintiffs' refusal to narrow their discovery demands."

In a November 2015 text order, the magistrate judge denied plaintiffs' motion to reopen discovery and for sanctions; and, in a February 2016 opinion and order, the district judge found that the record supported Kolbe's view of the discovery

disputes and declined to reverse the magistrate judge's deci-
sions. The district judge noted that although the magistrate
judge had "told plaintiffs several times to narrow and priori-
tize their discovery requests … and [had] suggested ways in
which they could do so[,] plaintiffs [had] failed to hone their
requests so that the electronic searches of [Kolbe's] electroni-
cally stored records would produce more relevant infor-
mation, as well as take less time." She also observed that
Kolbe had sought plaintiffs' agreement about the size, scope,
and pace of the production, and had kept them informed of
its progress at each stage. Finally, she noted that although
plaintiffs complained about Kolbe's "late" disclosure of its ex-
perts, Kolbe had in fact produced its expert reports on the day
to which plaintiffs had agreed.

In the same order, the district court granted Kolbe's mo-
tion to strike a declaration by Joel Wolf, one of plaintiffs' ex-
pert witnesses. By way of background: Plaintiffs had agreed
to an extended deadline for expert disclosures and had pro-
duced on the due date the joint expert report of Wolf and
Haskell Beckham. Wolf and Beckham had opined that several
design features worked together to cause decay: (1) an inade-
quate sill slope; (2) an inadequate gap between the sill frame
and the bottom of the sash; (3) a weatherstrip gasket on the
bottom of the sash that had trapped water on the sill; (4) an
exposed wood surface on the underside of the sash that had
been treated with the ineffective K-Kron or K-Kron II water
repellent; and (5) cracked K-Kron or K-Kron II protective coat-
ings.[5] Subsequently, plaintiffs produced a preliminary repair-

---

[5] Plaintiffs specifically alleged that double-hung and glider windows
had a defective K-Kron coating (defect #5); aluminum-clad windows had

estimate summary prepared by Wolf, estimating the cost of removing and replacing each of the plaintiffs' windows, and Kolbe deposed Wolf for a second time.

Six days before discovery closed, Kolbe produced the report of its expert, William Smith, who asserted that moisture absorbed by unprotected wood was attributable to improper finishing of the bottom of the lower rail by the homeowner or contractor. Wolf then filed his (later-stricken) declaration, which responded to Smith's report and submitted that, because of water pooling on the sill and the close proximity of the sill to the sash rail, the bottom of the sash would decay irrespective of the finish. Kolbe argued that Wolf's declaration was filed in violation of the preliminary pretrial-conference order, which had provided that there would be no third round of expert reports, and the district court agreed that the declaration "was an attempted third round of reports and … was untimely, giving defendant no opportunity to respond to it before the close of discovery."

### 4. First Motion for Class Certification

In August 2015, plaintiffs had sought to certify the following class under Federal Rule of Civil Procedure 23(b)(3): "All individuals and entities that have owned, own, or acquired homes, residences, buildings, or other structures physically located in the United States, in which Kolbe aluminum-clad windows or Kolbe wood Windows with K-Kron or K-Kron II coating are or have been installed since 1997 [that have manifested a defect]." Plaintiffs proposed to manage the class by

---

all of the defects except for an exposed wood sash (defects #1–3 and 5); and wood-casement, transom, and picture windows had all five defects.

dividing it into four nationwide subclasses based on the general type of warranty (express or implied) and the year of window installation: (1) breach of express warranty on windows installed from 2002 to the present; (2) breach of express warranty on windows installed from 1997 to the present; (3) breach of implied warranty of fitness for a particular purpose on windows installed from 2008 to the present; and (4) breach of implied warranty of merchantability on windows installed from 2008 to the present.[6] Plaintiffs also sought to certify the following class under Rule 23(b)(2) (seeking final injunctive or corresponding declaratory relief): "All individuals and entities that have owned, own, or acquired homes, residences, buildings, or other structures physically located in the United States, in which Kolbe aluminum-clad or wood Windows with K-Kron or K-Kron II coating are or have been installed since 1997 [that have not manifested a defect]."

Plaintiffs' motion for class certification also contended that, in addition to claims that the district court had specifically identified as having survived Kolbe's motion for partial

---

[6] In plaintiffs' reply brief in support of their first motion for class certification, they clarified that the first proposed subclass included "no-defect" and "failure-to-honor" express-warranty claims, and the second proposed subclass was limited to warranties based on product literature. As the district court had already determined that plaintiffs had waived any express-warranty claims based on statements in product literature, the court explicitly declined to certify the second subclass. Meanwhile, the third subclass could not be certified because the district court had already found that plaintiffs had no claims related to the breach of an implied warranty of fitness for a particular purpose. This left only two proposed subclasses—one for all the remaining express-warranty claims (both no-defect and failure-to-honor), and one for all remaining implied-warranty claims.

summary judgment,[7] plaintiffs also had viable claims that Kolbe had breached (1) an express warranty that its windows met certain association standards and building codes, and (2) an implied warranty that its windows were fit for a particular purpose.

Kolbe challenged the proposed classes and subclasses, contending that plaintiffs could not satisfy the requirements of Rules 23(a) and (b) because the class was unmanageable and there were too many material factual and legal differences among the proposed class members' claims. Kolbe also contended that plaintiffs had waived any express-warranty claims based on association standards and building codes by failing to mention such claims in plaintiffs' amended complaint or in their response to Kolbe's motion for partial summary judgment.

In its December 2015 order and opinion, the district court first concluded that because plaintiffs had not replied to Kolbe's assertion of waiver as to the building-codes express-warranty claims, plaintiffs had forfeited the issue. The district court also noted that those claims appeared to be the same "advertising-statement" express-warranty claims that the court had already dismissed at summary judgment, and as plaintiffs had not moved to reconsider the dismissal of those claims, plaintiffs could not reassert them at this stage of the proceeding. As for the claims of breach of implied warranty for fitness for a particular purpose, the district court found

---

[7] These included the Banks, Lohr, Senyk, and Deller plaintiffs' no-defect express-warranty claims; the McIver and Senyk plaintiffs' failure-to-honor express-warranty claims; and the Haley and Samuels and Groome plaintiffs' breach-of-implied-warranty claims.

that because plaintiffs had never alleged or established that they had purchased their windows for any particular purpose other than their ordinary function as windows, plaintiffs could not make out such claims under the Uniform Commercial Code and Wisconsin law.

The district court went on to deny plaintiffs' motion for class certification because they had failed to satisfy the requirements of Rule 23(a) and (b). The court noted that plaintiffs had proposed broad and overlapping classes (spanning eighteen years, all fifty states, and including multiple claims involving several types of windows with varying design defects) and had failed to address or account for the individualized proof and inquiries that appeared to be necessary to resolve the questions at issue.[8] Moreover, because as many as fifty state laws could apply to some of the class members' breach-of-implied-warranty claims, the court found that dividing the proposed multi-state class into state subclasses

---

[8] For example, no-defect and failure-to-honor express-warranty claims called for different evidence and raised separate questions with respect to Kolbe's and plaintiffs' conduct, causation (relating to, *e.g.*, window maintenance and upkeep, installation, home-state climate, etc.), potential defenses, accrual of the statute of limitations, potential tolling, and damages (which could vary depending on the number of windows, whether replacement or repairs were required, the extent of the damage, other features of each class member's home, etc., and may not be adequately covered by plaintiffs' proposed computer models). The proposed subclasses also failed to account for the different types of windows at issue (*i.e.*, double-hung and glider, aluminum-clad, and wood casement), each of which allegedly suffered different combinations of five separate defects, and the fact that designs for these three product lines had apparently changed substantially over the relevant eighteen-year time period.

would be unmanageable. The district court then offered plaintiffs the opportunity to renew their motion for class certification with respect to certain issues.[9]

> 5. *Second Motion for Class Certification and Exclusion of Plaintiffs' Experts*

In their second motion for class certification, plaintiffs again sought certification under Rule 23(b)(2) and (b)(3), this time proposing up to nine new subclasses; alternatively, plaintiffs requested certification of 34 "common issues" under Rule 23(c)(4). Kolbe opposed the second motion for many of the same reasons that Kolbe had opposed the first, and also argued that flaws in plaintiffs' expert opinions precluded certification, as plaintiffs could not establish defect and causation without expert testimony. (Kolbe had first raised these arguments in a *Daubert* motion filed prior to the plaintiffs' first motion for class certification and in Kolbe's response to plaintiffs' first certification motion.)[10]

---

[9] These included: (1) whether some of Kolbe's products contained defects that could result in rot; (2) whether Kolbe had disclaimed the implied warranty of merchantability; and (3) whether Kolbe had a uniform policy or practice of failing to honor its duty to repair, replace, or refund under its written warranty. The district court also explicitly warned plaintiffs that they "should take particular care to define manageable classes or subclasses that reflect the multiple claims, products, alleged defects and state laws at issue," and ordered them to submit a trial plan describing in detail the issues to be presented at trial, discussing whether and how those issues could be resolved by class-wide proof, and explaining how individual inquiries could be handled.

[10] Plaintiffs had stated in support of their first motion for class certification that they would address the *Daubert* issues raised by Kolbe; and plaintiffs submitted their *Daubert* opposition two months later. In the

With respect to Wolf, Kolbe had argued (and plaintiffs had not disputed) that Wolf had erred in assuming that Kolbe had designed its windows to have an unfinished bottom sash rail. In fact, Kolbe had instructed users to finish all edges and faces of its windows with paint, stain, or another approved coating, or Kolbe's warranties would not apply. [11] Kolbe had moved to exclude Beckham, plaintiffs' other expert, because he had done no tests or analyses comparing K-Kron's performance to that of any other type of paint—instead basing his opinions on the results of a test in which he had saturated pieces of wood with water, left one side of each exposed (some with K-Kron, the others bare), and waited to see how long it took each piece to dry—and had offered no opinions regarding the appropriate level of permeability for paint applied to windows.

As to Wolf, plaintiffs' response read in its entirety as follows:

> [T]he Court should reject Kolbe's argument that Mr. Wolf's opinions are deficient because he made an "erroneous assumption" about the unfinished undersides of the sashes. As an initial matter, Mr. Wolf's opinions about the unfinished underside of these Kolbe windows are just one aspect of a comprehensive indictment of the design of these windows, and as such are only one aspect of a myriad of valid criticisms

---

meantime, the district court had denied the first class-certification motion on its Rule 23 merits, with plaintiffs' experts still in place.

[11] Consumers could also choose to order their windows with a factory-applied finish, which apparently none of the plaintiffs-appellants did.

that are all firmly grounded in "scientifically valid principles," and all of which constitute "pertinent evidence." Moreover, even assuming for sake of argument that a particular window was left unfinished due to a failure of the home-owner/contractor to follow installation instructions, such a failure to adhere to the installation instructions was entirely foreseeable by Kolbe and therefore should have been accounted for in the design process. Mr. Wolf's evidence will therefore assist the trier of fact on this point.

(internal citation omitted). As to Beckham, Plaintiffs countered that his saturation tests had confirmed that the K-Kron paint "greatly reduce[s] the wood's ability to rid itself of moisture" and had supported his opinion that the K-Kron paint "leads to the Windows retaining an excessive amount of moisture, leading to rot and decay." Plaintiffs also characterized Kolbe as simply disagreeing with the type of K-Kron test it would have preferred.

After the parties had fully briefed the *Daubert* motion, plaintiffs also filed a motion for leave to submit additional evidence: a series of October 2007 emails between Kolbe's Vice President of Procurement, Quality, and Service and an individual at another window company, in which the latter had told the Kolbe VP that his company had discovered Kolbe was "leaving bare wood at the bottom of the … sashes for the identification label" and that "[t]his seem[ed] to be the worst possible area to leave unprotected." The emails continued, "Now when the painter goes to finish paint—he thinks that area is to be left natural—I'm concerned that we have bare wood that could suck up water and possibly rot out the bottom rails if

left unprotected." Plaintiffs argued that the emails showed that Kolbe had known that windows that had been ordered finished had unfinished undersides of sashes, and that Kolbe had been stamping its name and manufacturing date on the bottom of the sash, indicating that this edge was supposed to be left unfinished. The district court denied this motion to supplement because plaintiffs had already had ample opportunity to include this evidence in their response to Kolbe's *Daubert* motion, but had failed to do so. The district court also noted that the emails left unclear how long any purported practice of leaving the undersides of windows unfinished may have lasted, who had been affected, or whether Kolbe had remedied any mistake.

In March 2016, the district court also denied plaintiffs' second motion for class certification, agreeing with Kolbe that plaintiffs' experts had not provided reliable or helpful opinions regarding the existence of defects in Kolbe's windows. Specifically, the district court determined that Wolf had incorrectly assumed that Kolbe had designed its windows to have an unfinished lower sash, and that plaintiffs' response to Kolbe's *Daubert* motion was underdeveloped and unsupported. The court also held that plaintiffs' conclusory statements defending Beckham were insufficient to meet the *Daubert* standard, that there was no reliable scientific basis for Beckham's conclusion that K-Kron was a defective exterior paint, and that plaintiffs had forfeited any argument that Beckham's opinion was based on reliable methods (or provided relevant information) by failing to develop such an argument in their response. Additionally, the court ordered plaintiffs to show cause why the exclusion of their experts' opinions would not foreclose the named plaintiffs' individual

claims for the same reasons that it prevented class certification.

Plaintiffs then moved for reconsideration, challenging both the court's exclusion of the expert opinions and several other decisions. (Among other things, plaintiffs argued that the court should have ruled on their motion to exclude Kolbe's expert regarding customers' improper finishing of their own windows, that the court had incorrectly struck Wolf's declaration as an untimely-filed rebuttal report, and that the court had erred in determining that plaintiffs had waived their implied-warranty claims related to Kolbe's certification testing of its windows.) In June 2016, the district court denied plaintiffs' motion, finding that plaintiffs had largely rehashed old arguments or made untimely new ones that they had forfeited by failing to raise them in their response to Kolbe's *Daubert* motion.[12] The district court also clarified that it had not relied

---

[12] For example, plaintiffs had argued that the court had overlooked "ample record evidence" (*i.e.*, comments by Kolbe's inspectors, included in an appendix to the expert report, about problems with the slope, gap, and weatherstrip in windows with finished sashes) showing that Wolf had also inspected finished windows. Plaintiffs had also cited to data throughout Beckham's report purportedly linking his drying test (along with industry literature and "simple mathematics") to his conclusions on permeability, and plaintiffs had taken issue with the court's criticisms of Beckham's failure to test K-Kron's susceptibility to cracking or to run a test on actual windows installed in a home. The district court found that plaintiffs had failed to raise any of this in response to Kolbe's *Daubert* motion and that they had thus forfeited these arguments. The court also noted that Wolf had not included or linked to any of the evidence relating to finished sashes in the sill-to-sash theory included in the body of his report (that is, Wolf had developed and defined his opinion as involving *un*finished lower sashes).

(nor did it need to rely) on Kolbe's expert's opinion in its analysis or in the exclusion of Wolf's opinion.

The district court also found that plaintiffs had failed to show cause why their individual claims should not be dismissed. Plaintiffs had stated that they would present evidence of their own observations of their windows' failures along with the testimony of three Kolbe employees who either had observed the alleged defects or knew that Kolbe had been aware of the defects. Plaintiffs had also intended to introduce emails from Kolbe's distributors to the three Kolbe employees

---

Plaintiffs had also argued that the court had not understood how excluding Wolf's declaration would impact their motion for class certification and that the court had overlooked statements made by the magistrate judge and counsel during the preliminary pretrial conference suggesting an intent to allow rebuttal expert reports. Although the district court acknowledged that one of its concerns with Wolf's expert report had been addressed in Wolf's declaration, the court found that plaintiffs had provided no reasonable basis for allowing Wolf to file a rebuttal report six months after the expert-report deadline and after the close of briefing on Kolbe's *Daubert* motion. The court noted that the text of the preliminary pretrial conference order was clear, and that if plaintiffs had believed it was inaccurate, they should have brought that to the court's attention long before.

As another example, plaintiffs had claimed that their "ringer" theory (as to the window-certification testing) was part of their claim for breach of implied warranty of merchantability, arguing that the windows had failed to conform to labels stating the certification ratings. The district court first determined that the certification-related "ringer" claims still required expert testimony in order to establish that the windows were defective and thus unmerchantable. The court also agreed with Kolbe that, because plaintiffs had neither included this argument in their first class-certification motion nor pled it in their amended complaint or other filings made since that time, plaintiffs could no longer raise it.

in which the former had identified the design defects. The district court held that the emails constituted inadmissible hearsay and expert testimony, that plaintiffs had not explained whether the discussed defects had been observed in the types and models of windows purchased by the named plaintiffs, and that plaintiffs could not establish that the rot or water-intrusion problems had been caused by defects in the sill-to-sash interface or K-Kron coating as opposed to some other factor. The district court thus entered a final judgment in favor of Kolbe, and this appeal followed.

## II. Discussion

### A. Exclusion of Wolf and Beckham

Plaintiffs-appellants first appeal the exclusion of both of their experts. The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 requires the

district court to serve in a gatekeeping role and make "a pre-
liminary assessment of whether the reasoning or methodol-
ogy underlying the testimony is scientifically valid." 509 U.S.
579, 592–93 (1993). To determine the admissibility of expert
evidence, a district court looks at five factors:

> (1) [W]hether the particular scientific theory
> "can be (and has been) tested"; (2) whether the
> theory "has been subjected to peer review and
> publication"; (3) the "known or potential rate of
> error"; (4) the "existence and maintenance of
> standards controlling the technique's opera-
> tion"; and (5) whether the technique has
> achieved "general acceptance" in the relevant
> scientific or expert community.

*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003)
(quoting *Daubert*, 509 U.S. at 593–94). We review de novo
whether a district judge has followed Rule 702 and *Daubert*.
*See, e.g.*, *Kunz v. DeFelice*, 538 F.3d 667, 675 (7th Cir. 2008) (ci-
tation omitted). So long as the judge has applied the Rule
702/*Daubert* framework, we review the district court's deci-
sion to admit or exclude expert testimony for abuse of discre-
tion. *Id.* (citation omitted).

### 1. *Wolf*

Plaintiffs-appellants argue on appeal that the district court
acknowledged but failed to apply the *Daubert* five-factor test,
instead "improperly evaluat[ing] the factual accuracy of the
expert opinions." Plaintiffs-appellants contend that the dis-
trict court's finding of a factual mistake in Wolf's opinion was
"plainly wrong" given evidence proving that the finishing of
the sashes was irrelevant, and that considerations such as the

persuasiveness of an expert's opinion and the expert's credibility are relevant only in evaluating the persuasiveness of the testimony, not in determining its admissibility. Plaintiffs-appellants additionally and alternatively argue that the district court erred in excluding the entirety of Wolf's report instead of simply striking portions of it. Finally, plaintiffs-appellants claim that the district court's reading of Wolf's report is demonstrably incorrect because Wolf never opined or testified that all of the defects discussed in his report must be present for the windows to deteriorate.

The problem for plaintiffs-appellants is that they forfeited all of these challenges to Wolf's exclusion by failing to raise them in their response to Kolbe's *Daubert* motion. Wolf's report clearly assumed that the underside of the sash rails was "unprotected" and considered that fact a pertinent design factor in his analysis. Plaintiffs-appellants did not dispute that Wolf had erred in assuming that the windows had been designed to have unfinished undersides, and plaintiffs' initial brief in opposition to Kolbe's *Daubert* motion failed to make or develop any of the arguments plaintiffs-appellants later pursued on reconsideration and now argue on appeal. Although "our rules on waiver leave us discretion to excuse mishaps, … this appeal does not warrant an act of grace." *Alioto v. Town of Lisbon*, 651 F.3d 715, 722 (7th Cir. 2011) (internal citation omitted). Plaintiffs-appellants are responsible for having closed the door on their arguments in the first instance; we see no reason why they should now be permitted to belatedly reopen it.

### 2. *Beckham*

Plaintiffs-appellants also challenge the district court's exclusion of Beckham, who had opined that the K-Kron paint

was defective because it cracked, allowed moisture into the wood frames and sashes, and delayed the drying of wet wood by weeks. Plaintiffs-appellants argue on appeal that the district court's criticisms of Beckham's opinion again ought to have gone toward his credibility or the weight to be given to his opinion, not its admissibility, and that it is not the district court's role to decide what type of testing is appropriate. However, the district court's evaluation (and criticism) of Beckham's methods and analysis tracked Rule 702's requirement that an expert's testimony be the product of reliable methods applied to the facts of the case, as well as the *Daubert* factors concerning whether a theory has been tested, the standards controlling the technique's operation, and whether the technique has achieved general acceptance in the relevant expert community. The district court thus acted appropriately as the gate-keeper for Beckham's testimony.

Plaintiffs-appellants also claim not to have waived their arguments regarding the reliability and relevance of Beckham's opinions. Their *Daubert* response, however, shows otherwise. And while plaintiffs-appellants may not have waived the arguments they have since attempted to raise, they certainly forfeited them. *See, e.g.*, *Alioto*, 651 F.3d at 722 ("Our rules on waiver [and forfeiture] encourage parties to play their critical role."). Accordingly, we agree with the district court's determinations and conclude that the court's ultimate decision to exclude Beckham did not amount to an abuse of discretion.[13]

---

[13] As we affirm the district court's exclusion of Wolf and Beckham, we need not reach the parties' other arguments relating to the denial of class certification.

**B. Individual Express- and Implied-Warranty Claims**

Plaintiffs-appellants next argue that the district court erred in dismissing their remaining individual claims. Plaintiffs-appellants first generally (and extraneously) fault the district court for not referencing "a Rule, statute, or other procedural mechanism to guide Appellants' response" to the district court's order to show cause, and also complain that Kolbe never previously sought summary judgment on the issue of causation. However, the district court's course of action is akin to granting summary judgment sua sponte, which we have repeatedly held permissible, though it is a procedure that "warrants special caution." *Osler Inst., Inc. v. Forde*, 333 F.3d 832, 836 (7th Cir. 2003) (citation omitted). "When there are no issues of material fact in dispute, a district court may grant summary judgment on its own motion—as long as the losing party is given notice and an opportunity to come forward with its evidence." *Id.* (citing, *inter alia*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *see also* Fed. R. Civ. P. 56(f); *Goldstein v. Fidelity & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750 (7th Cir. 1996) ("The party against whom summary judgment is entered must have notice that the court is considering dropping the ax on [it] before it actually falls.") (citation omitted). The district court gave explicit notice here (absence of a formal rule citation notwithstanding), and plaintiffs-appellants cannot sincerely claim to have been taken by surprise. *See, e.g.*, *Osler Inst.*, 333 F.3d at 837 ("Osler clearly knew the issues that were bothering the judge. It wasn't ambushed by an argument that it couldn't possibly address.").

Plaintiffs-appellants next contend that genuine issues of material fact existed as to both the causation and defect aspects of their breach-of-express-warranty claims. Plaintiffs-

appellants assert that, even without expert testimony, a reasonable jury could have inferred causation from evidence such as emails from Kolbe and Kolbe's distributors, photographs, and various service-request forms.

As a preliminary matter, however, the district court acted within its discretion in deeming inadmissible various emails on which plaintiffs-appellants had hoped to rely. The district court held that emails from Kolbe's distributors to Kolbe employees allegedly identifying design defects contained inadmissible hearsay. Plaintiffs-appellants argue that the statements fell within the agent exclusion set forth in Rule 801(d), *see* Fed. R. Evid. 801(d)(2)(D) (statements "offered against an opposing party and … made by the party's agent … on a matter within the scope of that relationship and while it existed" are not hearsay), and that the existence of an agency relationship is normally a question of fact to be decided by a jury. However, we have held as a matter of law that a distributor who "buys goods from manufacturers … for resale to the consuming public," without more, "is not his supplier's agent." *Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993) (citations omitted). Although plaintiffs-appellants claim that, according to Kolbe's Basic Policy Guidelines Book, distributors were Kolbe "sales representative[s] acting on behalf of [Kolbe]," the Policy Guidelines in fact repeatedly address the distributors as "customer[s]" of Kolbe, and distinguish such customers from actual Kolbe sales staff (*e.g.*, by advising customers to contact Kolbe sales representatives).

Moreover, the district court also declined to admit the distributor emails because they would have constituted inadmissible expert testimony. Plaintiffs-appellants cite to *United States v. Sweeney*, 688 F.2d 1131, 1145 (7th Cir. 1982), and claim

that the distributors' testimony was lay opinion within the scope of Rule 701 because it was based not on specialized knowledge within the scope of Rule 702, but rather on knowledge obtained through the witness's vocation or avocation. In *Sweeney*, however, we dealt with lay testimony of witnesses identifying a drug they had known and used in the past. *See id*. Those circumstances were entirely different from what we have here: various distributors (*i.e.*, third-party retailers) expressing opinions about the *design* of Kolbe's windows. While the distributors' emails may have been based on personal observations, the opinions and conclusions on which plaintiffs seek to rely go beyond what a salesperson could "rationally" opine in light of his or her work experience. *Cf. Plyler v. Whirlpool Corp.*, 751 F.3d 509, 514 (7th Cir. 2014) (holding that lay witness "could testify to his observations of the fire and its aftermath, but not draw inferences about its origin, which requires specialized knowledge"). To the extent that some distributors may have had design or engineering backgrounds that they could have drawn on to rationally make the necessary connections, that technical knowledge would have been unrelated to their jobs as distributors, and they would indeed have been offering unnoticed expert opinion. *See, e.g., United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (explaining that lay-opinion testimony is not admissible "to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events") (citation omitted).

Meanwhile, the other evidence to which plaintiffs-appellants cite falls short of showing causation, and, without expert evidence, may even fail to establish a design defect. Though internal emails, service-request forms, and photos of rotting

or leaking windows may suggest problems with Kolbe windows, this evidence fails to link such problems to an underlying design defect, as opposed to other, external factors such as construction flaws or climate issues. Consequently, plaintiffs-appellants' remaining individual claims for breach of express or implied warranty cannot survive.

Plaintiffs-appellants also appeal the district court's determination that they waived their implied-warranty-of-merchantability claims related to false or misleading labeling (*i.e.,* the "ringer" certification theory). Plaintiffs-appellants point to general allegations in their amended complaint that "Kolbe impliedly warranted that the Windows were properly designed, developed, manufactured, distributed, and marketed; that the designs and materials were proper and of first-class and workmanlike quality; that the Windows were fit for their intended use"; and that "Kolbe breached its warranties by … failing to inspect and identify windows and/or materials with defects, and failing to provide defect-free windows to [plaintiffs-appellants]." These allegations, however, are too vague to have made out the claims at issue. And even if allegations of impaired marketing-and-development warranties could be stretched to encompass the "ringer" claims, plaintiffs-appellants still failed to develop or advance such claims until their first motion for class certification, despite having had ample opportunities to raise these claims previously.[14]

---

[14] Moreover, the claims would still require expert testing and testimony in order to establish that plaintiffs-appellants' particular windows fell short of the certification, were defective, and thus were unmerchantable. Additionally, as Kolbe points out, the only two sets of plaintiffs-appellants whose implied-warranty claims survived summary judgment—

### C. Samuels's and Groome's WDTPA Claims

For some reason, plaintiffs-appellants Samuels and Groome also try on appeal to resurrect their claims under the WDTPA. To recover for a violation of the WDTPA, plaintiffs-appellants must prove that Kolbe, in order to induce a sale, made a representation that was untrue, deceptive, or misleading, and caused pecuniary loss. *See K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732 N.W.2d 792, 798–99 (Wis. 2007) (citation omitted). Plaintiffs-appellants emphasize that the Wisconsin Supreme Court has unequivocally stated that *reliance* is not an element of the WDTPA, *see Novell v. Migliaccio*, 749 N.W.2d 544, 550 (Wis. 2008), and thus claim that the district court erred in its analyses below.

However, the absence of a reliance requirement does not relieve plaintiffs of the need to establish *causation*—*i.e.*, that the alleged misrepresentation somehow caused them loss. And both Samuels and Groome testified before the district court that they had neither seen nor cared about any allegedly false advertising by Kolbe—their builder had used only Kolbe windows, and that fact had no effect on their choice to proceed with buying their home. It is difficult to imagine a more transparent death knell to a WDTPA claim. Also, as the district court rightly noted, the only representations to which plaintiffs-appellants point as establishing the first prong of the above test (*i.e.*, representations that the windows were of "high quality," etc.) are vague puffery, even when viewed in the light most favorable to plaintiffs-appellants.

---

the Haleys, and Samuels and Groome—would be unable to assert these claims because neither received the certification labels in question.

### D. Due Process

Finally, plaintiffs-appellants point to five of the district court's rulings[15] and contend that, together, these rulings deprived plaintiffs-appellants of due process. *See Complaint of Bankers Trust Co.*, 752 F.2d 874, 890 (3d Cir. 1984) ("Due process mandates that a judicial proceeding give all parties an opportunity to be heard on the critical and decisive allegations which go to the core of the parties' claim or defense and to present evidence on the contested facts.") (emphases omitted). First off, plaintiffs-appellants may very well have forfeited this argument by failing to raise it directly before the district court. *See Varner v. Ill. State Univ.*, 226 F.3d 927, 936–37 (7th Cir. 2000) (arguments inadequately developed before the district court are waived, "even where those arguments raise constitutional issues" (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991))). Second, even construing plaintiffs-appellants' motions for reconsideration and appeals to fairness at various stages of the litigation as implicit invocations of this due-process argument, such a claim fails on the merits. As explained above, with respect to each ruling, plaintiffs-appellants had ample notice and opportunities to be heard, which more often than not they squandered.[16] Thus,

---

[15] The rulings at issue are: (1) the denial of plaintiffs' second class-certification motion; (2) the dismissal of plaintiffs' individual claims; (3) the *Daubert* rulings (where the court relatedly did not allow plaintiffs to submit a rebuttal expert report, consider their sur-reply, rule on plaintiffs' motion to exclude Kolbe's expert, or allow testimony from the parties' experts); (4) the ruling on plaintiffs' motion for reconsideration on the WDTPA claims (where the court declined to consider "newly discovered evidence"); and (5) the denial of plaintiffs' motion to reopen discovery.

[16] Indeed, plaintiffs-appellants continue to belatedly raise forfeited arguments even on appeal. For example, they argue for the first time in their

none of the district court's decisions, either individually or collectively, rose to an abuse of discretion. Just because plaintiffs-appellants repeatedly missed their opportunities to make various arguments, and then disliked the consequences, does not mean they were deprived of process. *See, e.g., Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013) ("federal entitlement is to process, not to a favorable outcome").

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

reply brief on appeal that the district court's refusal to impose any sanctions on Kolbe also factored into the alleged due-process violation.